NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0570n.06

No. 07-2481

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Aug 30, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| KEVIN TUCKER, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| JOHN CASON, Warden, | ) | |
| | ) | |
| Respondent-Appellant. | ) | |
| | ) | |

Before:  SILER and GIBBONS, Circuit Judges; REEVES, District Judge.[*]

**DANNY C. REEVES, District Judge.**  Respondent-appellant John Cason appeals the

district court's conditional grant of petitioner-appellee Kevin Tucker's petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254.  For the following reasons, we reverse the district court's

decision.

I.

Tucker was charged with four counts of first-degree criminal sexual conduct involving his

daughter, AT.  The State alleged penile/oral penetration, penile/anal penetration, foreign object/anal

penetration, and penile/vaginal penetration.[1]  The acts were alleged to have occurred sometime in

---

[*]The Honorable Danny C. Reeves, United States District Judge for the Eastern District of
Kentucky, sitting by designation.

[1]Although the State initially charged penile/vaginal penetration, the fourth count presented
to the jury was digital/vaginal penetration.

1

the summer of 1996, when AT was five years old, shortly before Tucker and AT were involved in a serious automobile accident.

Tucker was tried before a jury in Macomb County Circuit Court. At trial, AT testified that she and her father were home by themselves watching television when he instructed her to remove her clothes. She complied, and he removed his own clothes. Next, according to AT, Tucker put his penis in her vagina, anus, and mouth. He then "shoved" the eraser end of a pencil "up [her] private."

Dr. Jay Eastman, a pediatrician specializing in the examination of child abuse victims, testified as an expert for the prosecution. He had not examined AT but had reviewed a report prepared by Dr. Norma Inocencio following her examination of AT in October 1999, after the abuse allegations came to light. Dr. Eastman testified that Dr. Inocencio's findings of irregularities in AT's hymen and anus were "compatible with sexual abuse." On cross-examination, defense counsel asked Dr. Eastman if he was aware that AT had been in a serious accident. Dr. Eastman responded that he knew about the accident and believed AT had suffered a broken leg, but he was unsure of her other injuries. Dr. Eastman acknowledged that medical records from the accident might be significant for purposes of a sexual-abuse examination if, for example, the accident had involved "a penetrating injury to the vagina."

In fact, AT sustained extensive pelvic injuries in the accident, which occurred in mid-August 1996. Further, AT experienced vaginal bleeding as a result of her injuries. To determine the cause of the bleeding, doctors performed manual explorations of her vagina, as well as a vaginoscopy. These procedures entailed the insertion of a finger or medical instrument across AT's hymen into

2

her vagina, which could have resulted in hymenal trauma. However, this information was not presented to the jury, presumably because defense counsel had not obtained AT's medical records from the accident.

Nevertheless, during closing arguments, Tucker's attorney noted Dr. Inocencio's failure to review those records:

> And you will remember the testimony regarding the fact that [AT] had had a serious accident. And I asked the doctor, did you review — actually I asked him did the doctor who wrote the report review the accident reports or the medical reports? And the answer was there is no indication in that report that those reports had been reviewed. And I suggest to you might that not be important to review reports? Do we know that something of that nature didn't happen during the course of the accident?

In rebuttal, the prosecution argued:

> Now, defense attempts to show about how the victim was in a serious car accident so maybe something in that car accident may have caused her hymen to be missing and deep anal fissures. Well, I'm not certain what kind of car accident that would be, however, defense has the exact same subpoena powers as the prosecution as you can tell, because they called witnesses as well, and there was not one doctor that got on that stand that said when [AT] was in this car accident she was penetrated by something. There is no evidence to say that. The only evidence to say that she was penetrated is the evidence of [AT]'s testimony that said she was penetrated by her father sexually. To go from there to some sort of car accident mishap is a quantum leap that this jury should not make.

The jury convicted Tucker on the first three counts but found him not guilty of digital/vaginal penetration. Tucker received concurrent sentences of 85 to 240 months of incarceration on each count. He moved for an evidentiary hearing and a new trial, arguing that his counsel was ineffective because he had not obtained AT's medical records from the car accident. The court granted Tucker's request for an evidentiary hearing. Among the witnesses who testified

at the hearing was Dr. Inocencio, who had since reviewed AT's emergency-room records from the accident.[2] The pertinent portions of Dr. Inocencio's testimony are discussed below.

Following the hearing, the trial court determined that defense counsel's failure to obtain the medical records was not objectively unreasonable, and Tucker's motion for a new trial was denied. Tucker appealed his convictions to the Michigan Court of Appeals, asserting four grounds for relief. The only claim relevant for present purposes alleged various deficiencies in his trial counsel's performance, including the failure to obtain AT's medical records from the accident.

The state court of appeals affirmed Tucker's convictions in an unpublished per curiam decision. *People v. Tucker*, No. 232094, 2003 Mich. App. LEXIS 563 (Mich. Ct. App., Mar. 4, 2003). Tucker then filed an application for leave to appeal in the Michigan Supreme Court. However, the application was denied. *People v. Tucker*, 469 Mich. 903, 669 N.W.2d 816 (2003). In October 2003, Tucker filed the subject petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising the same four claims for relief asserted in his direct appeal.

The district court found merit in Tucker's ineffective-assistance claim with respect to his counsel's failure to obtain the medical records. The court thus conditionally granted habeas relief, ordering that Tucker be released unless the State elected to retry him on the underlying charges within seventy days. *Tucker v. Cason*, No. 03-10254, 2007 U.S. Dist. LEXIS 78329, at *66 (E.D.

---

[2]AT was treated at Mount Clemens General Hospital immediately following the accident. She was then transferred to Children's Hospital, where she remained for approximately two months. Dr. Inocencio reviewed only the Mount Clemens records.

No. 07-2481
*Tucker v. Cason*

Mich., Oct. 23, 2007). This appeal followed.[3] The district court granted the respondent's motion

to stay and Tucker's request for release on bond. On November 29, 2007, Tucker was released on

a $50,000 bond pending resolution of the appeal.

II.

A district court's decision to grant a habeas petition is subject to de novo review. *Murphy*

*v. Ohio*, 551 F.3d 485, 493 (6th Cir. 2009). Because Tucker's petition was filed after the effective

date of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat.

1214 ("AEDPA"), that statute's provisions apply. *See Murphy*, 551 F.3d at 493. AEDPA permits

federal courts to grant habeas relief with respect to claims previously adjudicated on the merits in

state court only if the state court adjudication,

(1)     resulted in a decision that was contrary to, or involved an unreasonable
        application of, clearly established Federal law, as determined by the Supreme
        Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the
        facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state-court decision falls under the "contrary to" clause of § 2254(d)(1) "if the state court

arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the

---

[3]Tucker also filed a Notice of Appeal, cross-appealing from those portions of the district court's October 2007 Opinion and Order that were adverse to him. Tucker's cross-appeal, No. 08-10, was consolidated with the instant case. However, this Court found that Tucker had abandoned three of his claims for relief and ultimately denied a certificate of appealability with regard to the remainder of his ineffective-assistance claim. As a result, the only issue currently before this panel is whether the district court properly granted habeas relief based on defense counsel's failure to obtain AT's medical records from the auto accident.

state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision is also contrary to clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Id.* at 405. Likewise, habeas relief is appropriate under the "unreasonable application" clause if the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* For purposes of the "unreasonable application" clause, it is not enough that a federal habeas court finds the state court's application of federal law to be erroneous or incorrect. Instead, the application must be objectively unreasonable. *Id.* at 409-12.

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must establish that the state court's decision was contrary to, or involved an unreasonable application of, the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under *Strickland*, a defendant must first establish "that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The second prong of the *Strickland* inquiry is whether the defendant was prejudiced by his attorney's deficient performance. *Id.* To satisfy the prejudice requirement, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. If the defendant suffered no prejudice as a result of his attorney's performance, it is irrelevant whether that

6

performance was deficient.[4]  *Id.* at 697.

Although the state court's decision must be consistent with Supreme Court precedent, the state court need not cite or even be aware of applicable Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).  However, a decision is contrary to clearly established federal law where the state court recites the *Strickland* test but applies a more demanding burden of proof to the prejudice inquiry. *Fulcher v. Motley*, 444 F.3d 791, 799 (6th Cir. 2006) (citing *Williams*, 529 U.S. at 405-06).  In such cases, we review the merits of the ineffective-assistance claim de novo, unconstrained by § 2254(d). *Id.* (citing *Williams*, 529 U.S. at 406).

Here, the state appeals court did not cite *Strickland* but recognized the two-prong test set forth in that decision: "A successful claim of ineffective assistance of counsel requires a defendant to 'show that counsel's performance was deficient and that there is a reasonable probability that, but for the deficiency, the factfinder would not have convicted the defendant.'" *Tucker*, 2003 Mich. App. LEXIS 563, at \*5 (quoting *People v. Snider*, 239 Mich. App. 393, 423-24, 608 N.W.2d 502

---

[4] The Supreme Court, recognizing that this will often be the case, has instructed that "there is no reason" to address the performance aspect first "or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697; *see also Baze v. Parker*, 371 F.3d 310, 321 (6th Cir. 2004) (finding it unnecessary to address the issue of attorney competence where the defendant could show no prejudice from counsel's arguably deficient performance).  Thus, because we find no reasonable probability that the outcome of Tucker's trial would have been different but for his attorney's failure to obtain the medical records, we need not evaluate counsel's performance.

(2000)).[5] Nevertheless, the court ultimately applied a stricter standard for assessing prejudice:

> Moreover, we note that developing the possibility that the accident could have resulted in physical conditions resembling those commonly associated with sexual abuse would only have presented an alternative explanation for the complainant's physical condition. It would not have eliminated the possibility of sexual penetration, nor would it have called into question the victim's compelling testimony against defendant. Accordingly, we cannot conclude that, but for trial counsel's failure to refute the prosecution's expert testimony, defendant would not have been convicted. Consequently, we reject defendant's contention that counsel was ineffective as to this issue.

*Id.* at *13-*14 (internal citations omitted).

As the district court correctly noted, "[t]he standard for determining prejudice is not whether effective advocacy would have 'eliminated the possibility' that the defendant committed the crime or that the petitioner 'would not have been convicted.'" Rather, Tucker was merely required to show a reasonable probability that his attorney's errors affected the outcome of his case. *Tucker*, 2007 U.S. Dist. LEXIS 78329, at *44 (citing *Strickland*, 466 U.S. at 694). Thus, the state-court decision was contrary to *Strickland*, and the merits of Tucker's claim must be reviewed de novo. *See Fulcher*, 444 F.3d at 799. Under any standard of review, however, Tucker has made an insufficient showing of prejudice.

Tucker argues, and the district court concluded, that AT's medical records from the accident would have provided the jury with an alternative explanation for the irregularities described in Dr. Inocencio's report. *See Tucker*, 2007 U.S. Dist. LEXIS 78329, at *45. In particular, the district court found it significant that the jury heard "no alternative explanation for the injuries to AT's

---

[5]In *Snider*, the Michigan Court of Appeals cited *People v. Pickens*, 446 Mich. 298, 312, 521 N.W.2d 797 (Mich. 1994), in which the Michigan Supreme Court cited *Strickland*.

genitals." *Id.* at *46. Yet Tucker was acquitted of the one charge to which such an alternative explanation would have been relevant: the digital/vaginal penetration charge. Thus, presentation of evidence that "the doctors treating AT after the car accident inserted fingers and medical instruments into her vagina to determine the cause of the vaginal bleeding," would not likely have resulted in a more favorable outcome for Tucker.

The only information in the medical records of apparent relevance to the charges of which Tucker was convicted is a notation that AT had "good sphincter tone" following the automobile accident. At first glance, this notation, as well as the absence of any indication of trauma to AT's anus at the time of the accident, appears to contradict Dr. Inocencio's later finding that AT had deep anal fissures consistent with sexual abuse. However, Dr. Inocencio testified at the evidentiary hearing that sexual abuse would not necessarily affect a child's sphincter tone; rather, sphincter tone would only be damaged in cases of severe abuse involving the use of force.[6] Moreover, according to Dr. Inocencio, sphincter tone is better determined through the use of a colposcope, a procedure generally not undertaken in emergency-room examinations.

More significantly, however, the medical records provide no alternative explanation for the anal fissures noted in Dr. Inocencio's report. Dr. Inocencio testified that there "definitely" would have been an indication in the medical records if anal bleeding or fissures had been observed following the automobile accident. A child-abuse expert who also reviewed the accident records

---

[6]The applicable statutory definition of "sexual penetration" includes "any . . . intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body." MCL § 750.520a(r); *see* MCL § 750.520b(1)(a). Thus, the State was not required to prove that Tucker penetrated AT forcefully.

after trial, Dr. Stephen Guertin, found nothing of significance in the records with respect to the anal-penetration charges. While the absence of anal trauma after the accident tends to undermine the State's theory as to when the abuse occurred, it is even more damaging to an argument that the injuries noted by Dr. Inocencio were the result of the accident and not sexual abuse. Thus, the hospital records would have been of little, if any, help in countering the medical evidence presented by Dr. Eastman regarding the anal-penetration charges and, in fact, would not have supported the argument Tucker now contends his trial counsel should have pursued.

In any event, there was little to refute. The extent of Dr. Eastman's trial testimony regarding AT's anal injuries, given during direct examination, was as follows:

A       The other thing that Dr. Inocencio mentioned is her anal findings.

Under anus,

"Done in a 'supine' position with child holding on to both flexed knees that are flexed at hips."

"Irregular slightly crythematous perianal folds. Deep fissures at 3, 4, 6, 8, 9, 12 o'clock. Immediate moderately prominent venous congestion at 4, 6, 8, 9-10 o'clock is seen. Linear vertical line extending posteriorly from 6 o'clock. No lesions, bleeding, discharge or bruising noted."

Again, compatible with abuse.

Q       And is that deep fissures at certain areas of the clock, what is that?

A       That's areas where the mucosa has broken and then healed back together, leaving a fissure.

Q       Okay.

And is that something you would normally see in a nine year old?

10

A	No, it's not.

Given this relatively brief discussion, as well as Dr. Inocencio's later testimony that good sphincter tone is not necessarily inconsistent with sexual abuse and the lack of any other information contained in the medical records relevant to the charges of conviction, we cannot find that it is reasonably probable the jury would have reached a different conclusion had the records been presented at trial. Defense counsel's failure to obtain the records therefore resulted in no prejudice. Thus, his performance, regardless of whether it was up to professional standards, did not constitute ineffective assistance under *Strickland*.

III.

For the foregoing reasons, we reverse the district court's grant of habeas relief.